It looks like I'll say what Judge Fletcher said yesterday after a similar incident, and it looks like the people here weren't here to see your case, I guess. But we are very interested in hearing your arguments, so you may proceed at any time. Your Honor, I tell people that the worst thing a doctor or a lawyer can tell you is you have a very interesting case, and I guess I'll add to that if the court starts off. I guess the courts like the interesting case. Perhaps one unusual aspect of this case is that the facts are undisputed. State your name for the record, please. I apologize for that. Your Honor, Ed Sangster from K&L Gates on behalf of Mr. Cabrera, and I'm here with my partner, Matthew Ball. First question is whether or not the federal securities law applies. Not in my opinion, but it was raised on appeal for the first time by the plaintiff in citing the Morrison case. This case is fundamentally different from Morrison. Morrison involved a foreign plaintiff suing foreign and American defendants for conduct that occurred in a foreign country. This case involves a California plaintiff suing under a contract that's governed by California law, and it's suing to recover compensation for services that were performed in California and throughout the United States. Let me interrupt respectfully. Judge Seaborg found that the, to go to your point, that the interests in the sugar cane properties that your client was contracting with ADM Brazil over were not securities, and therefore, if those were not securities and we, in deference to his legal judgment, find them to be correct, since all the facts are not in dispute, that's the end of the case, right? First of all, this is a de novo review, and the court affords the district court no deference. So secondly, I don't believe Judge Seaborg found that these were not securities. I think the court's opinion is very carefully worded so that it does not make that finding. It simply says this is not the type of transaction that is subject to the securities laws. But even if the court had made that finding, this court looks at the issue de novo. All right. Well, I believe that sugar cane, just as a person, I believe that sugar cane properties in this context are not securities, and we should affirm the district judge. Your Honor, they were not. Why wouldn't I come to that conclusion? Because it wasn't sugar cane properties. It was common stock, and there were interests in limited liability companies. Common stock is a quintessential security. It's been described as that. What was sold was common stock. That was undisputed in the district court. It's undisputed here. But we look at the overall transaction, don't we? That is correct, Your Honor. And here, those at one point start off at stock, but ultimately it was the property, and then we look at who is going to manage the property. Aren't we guided by the law to look at who's going to manage the property? Isn't that an important factor? I don't think when the case is focusing on the regulated activity, and the regulated activity is the brokering of the securities. And that's what Mr. Cabrera's defense was. You, I think, have conceded that the quotas acquired by ADA Brazil were not securities. Correct. So I don't know if that helps you. It may not help me, but it's the truth. So it's just, I mean, the fact is No, I know, but I'm just saying, I mean, as we look at the overall transaction, just, I'm not sure how we get to where you want us to get. So the transaction starts with what are, undisputedly, securities. Common stock and limited liability interests. The Supreme Court in United Housing Foundation said that simply because the shares of sales of quote stock does not necessarily mean that this is a security transaction. I think what Judge Merguia points out is that going behind the language, what Iguazu did was to put your client and ADM Brazil in a position through these transactions to do business for which they expect compensation. Now, whether it was deemed or labeled stock is one thing, but the facts of the transactions and their agreements appear to be otherwise. Well, it was more than just the labels, Your Honor. It was the actual nature of the interests, and that was we presented in the district court undisputed evidence about what the nature of the interests were. We didn't simply rely on the label of common stock. We had Professor Salama's declaration, which explained what rights were available, and those are the rights that match up with the definition of a security. So we didn't simply. I'm sorry to interrupt again, but we look at all that de novo. Essentially, we want to look at the Limera transaction and the Jatai transaction and determine whether the purchase of the company owning the fields at Jatai constituted securities, right? I think what you want to look at is whether or not Iguazu was brokering securities, and that's what it's seeking its compensation for. I don't think you look at what the securities, the company for which the securities were issued owned. Your Honor is focusing on what were the assets that these companies owned, not the ownership interests in those assets. And it's the ownership interests that constitute securities. I'm not aware of any securities case where the court focuses on the assets rather than the interests, and it's the interests and the rights afforded by those interests that make these securities. And as I said, Professor Salama went through and explained what rights were available and making clear that, for example, Mr. Cabrera had no right to manage the Jatai Limited Partnership. And under California law, under California law, if there's not a right to manage, if all parties don't have a right to manage and don't actively participate, as a matter of fact, not just a right, they have to actively participate and manage, then it is a security by definition. Well, that all sounds very persuasive. I know we're to look at the district court's characterization of the transactions de novo, but Judge Seaborg did look at the facts and said that the economic reality and all the evidence surrounding what was going on was that there was no licensing, there was no evidence that any transactions were structured to avoid securities laws here. The economic reality was simply not such that it would implicate any of the types of factors that would implicate securities law. And Judge Seaborg never explained why. That's what was missing from his analysis. He simply, he stated his understanding of the statutes that Congress passed. He simply said, in my reading of it, is he simply said these were two sophisticated entities and I don't think the securities law needs to apply. So we looked de novo at the record and determined if he was correct, why. If he was incorrect, it's based on what you told us regarding the case in Brazil, right? Correct. I'd say it's based on the evidence that we have presented, which wasn't disputed, in that that was that ADM paid cash for securities. And what it paid Baniff for was common stock, and what it paid Alexander Cabrera for was interest in a limited liability company who did not pay for property. They paid for stock and limited liability company interests. And I'm looking at Howie, I guess is the decision, and the important question there is whether the investor will derive profits solely from the efforts of others. How does that apply to your case? How does that apply to your case? So what it means is the interests acquired by ADM were not securities, and the interests that were sold were securities, because the parties who owned the interests beforehand were, in fact, depending on the efforts of others. So, I mean, it's kind of, it all changes on the date of the final transaction. But there, I don't think there's been any And what's your authority for that? What case are you relying on to say that, that it changes on the final day of the transaction? I'm not relying on authority. That's just a fact. I mean, it was, I don't think that plaintiff's counsel can point to anything in the record that contests the fact that these were securities before this transaction occurred, and the transaction all occurred. It was a multi-step transaction that all occurred on one day. But, I mean, still I don't know that you've addressed that, you know, the law tells us that we're supposed to look at the economic reality and the overall transaction and who ultimately is managing the property. I haven't heard you're just relying on that one point that at the beginning, you know, they were in this posh. Well, I'm relying on two points. It wasn't just at the beginning. It was throughout the time that the brokering activity occurred. And it's the brokering activity that we contend was illegal. And it was an illegal contract because she entered into a contract to broker securities. And, in fact, that's what she did. But by happenstance, the transaction was consummated to create what are effectively joint venture interests. But the illegal activity had already occurred. The illegal purpose of the contract had already been effected. And it's that activity for which Iguaçu is seeking compensation. It's not. But you're, so you're looking at one step. I'm looking at the step, I'm looking at the step during which the regulated activity occurred. That's what our position is, is that you should, when are you of the transaction. The economic reality is ADM paid Baniff for common stock. It made a direct cash payment to Baniff. It paid Alexander Cabrera for limited liability company interests. Those were securities. Cash went straight to them. We think that's the economic reality of the transaction. And they were not registered with those shares of stocks as securities, were not registered with those shares of stocks. So the transaction between Iguaçu and your client was illegal, and he doesn't have to pay him the $480,000? Yeah. I don't think it depends on the registration issue, Your Honor. I think that's really irrelevant. That's what Judge Seaborg said, that there was no licensing, I think, was it? Excuse me. I thought you were talking about registration of the securities. Oh, right. Registration in the context he was using, which is you need to be registered as a broker-dealer. Right. So sometimes we refer to licensing and registration, but that's different from registering of securities. Whether or not the securities are registered, well, if they're registered, they are by definite. They wouldn't be registered unless they were securities. Okay. But you don't limit the analysis of securities to things that have been registered with the SEC. Okay. Do you want to reserve? I would like to reserve a minute and a half. Thank you. Good morning, Your Honors. Robert Cross of Skutski & Durer for the plaintiff and appellee, Iguaçu, Inc. I'm sorry. I missed the firm. Skutski & Durer. Thank you. It's not easy for me to get people's e-mail addresses correct either. So my colleague and my former partner at council table, Constance Yu of Seidman & Bancroft, who co-tried the case with me some years back, I believe the court has identified the issue and has identified that Judge Seaborg correctly analyzed the issue, namely, what is the economic reality of this transaction for which Iguaçu contracted. It contracted with one and only one party, namely, Mr. Cabrera. The contract is a two-party contract. Mr. Cabrera's brother, his wife, his lender are not parties to the contract, and they were not Iguaçu's concern. In fact, Iguaçu didn't find out about them until later. Iguaçu was asked by Mr. Cabrera to see if they could find an investor to create a fossil fuel plant on his property. They did. They found ADM, and it was ADM's Brazilian subsidiary which did all of the work. The only aspect of ADM's U.S. headquarters in Decatur was that they had to write and give the final approval for the transaction, which happened about a year later. The agreement was entered into in November 2007. The final documents in the closing didn't happen until almost a year later in October 2008. And, of course, during that whole year, ADM Brazil, through its CPAs, through its attorneys, through its other experts, totally expertise this transaction before deciding to do it. And, therefore, the real issue here is do the U.S. securities laws really have any place in a transaction occurring in Brazil between a Brazilian subsidiary and a bunch of Brazilian citizens, the only involvement of which related to the U.S. is that somebody in San Francisco made a couple of phone calls and sent a couple of e-mails. Can I ask you a question? Yes, sir. That all squares with my understanding of the facts as well. But what Mr. Sangster just said was that, and I guess this is where the issue would be joined as well, that the transactions between the Brazilian subsidiaries and the Brazilian citizens involved what by all of us can see would agree were shares, shares of stock. And if those two parties are dealing in shares of stock, regardless, as Mr. Sangster says, of the interest that the stock represents, an American company, Iguazu, brokered that transaction, which involved the shares of stock, and should be subject to I think it's Rule 11 of the Securities Enforcement Act. Well, the fact that there were two entities, as you know, one was the CCEAA or, quote, La Mera entity, which was a stock company before it was acquired. The other was a JETE, which was a Brazilian form of LLC before it was acquired. But what ADM wanted to do and what ADM did do and what ADM's senior vice president testified to, Mr. Lastra, we wanted a joint venture with Mr. Cabrera and only with Mr. Cabrera. We didn't want a bunch of people as our partners. We wanted him. It was his land, and he was the former minister of agriculture. He was a large landholder in Brazil, and he was the one who wanted to get into this business. ADM brought capital and ADM brought expertise to the deal. He brought a piece of land. And, yes, it was owned, one of the pieces of land was owned previously in a stock company, but ADM did not pay for stock. ADM paid Mr. Cabrera. Anything Mr. Cabrera did with the money, which ADM understood he would do with it, was to pass it on and buy out his former co-investors. So it was not ADM buying out the investors. No, but those are the stock transactions. Cabrera had to buy shares in the Limera transaction from Bardana. ADM Brazil paid for those shares. Similarly, in the Jatai transactions, even though it was a limited liability corporation, there were shares of interest that Cabrera's brother had to give to Cabrera. Those are, quote-unquote, stock or securities transactions which were facilitated by Iguazu. That's how I understand Mr. Cabrera's argument. Well, that is the argument. I quite agree with you. The question is, though, ADM did not deal directly with Mr. Cabrera's brother or with his bank or with his wife, who held these partial interests. It dealt only with and its contracts were only with Mr. Cabrera. It knew and he said, I'm going to buy out so that I will now own 100 percent of these entities, these new LLC entities we're forming. I will own 100 percent and you will buy 49 percent of one, the Limera entity, and you will buy 80 percent of the other, the Jatai entity, which was how the ultimate transaction was structured. Unlike the case in the M&A West case, which we didn't really discuss, but which is the closest case in point that we have both found to this situation, in that case the court, the Ninth Circuit, looked through a two-part transaction and said, we're going to collapse this because the economic effect of this is that somebody was attempting to avoid, in that case, registration. Can I move an M&A West case? I'm sorry. M&A West. It's cited at page 17 in our brief. 538F3-1043. That's the leading case on the question of how do you look at a transaction that involves component parts. And, hell, you don't. You look through those parts and collapse them when the intent is thereby to avoid securities laws applying to them. I guess let me circle back a little bit. I'd just like for you to take another run at this. You know, why don't the quotas that acquired by ADM Brazil, is it right? Yes. Actually, two subsidiaries were formed for that purpose, but they were controlled by ADM Brazil. Qualify as securities here, especially when we look at the Supreme Court's decision in Lamberth Timber. Well, because what ADM acquired were participating, controlling interests in two LLCs, and LLCs like general partnerships are thought to be not securities where the investor, the buyer, ADM in this case, buys in and is not putting its money at risk through the management efforts of others, but is actually intending to and does help run those businesses. And that's what — there's no dispute in the record that that's what ADM intended to do and did do, and thereafter continued to run the businesses with Mr. Cabrera as joint venturers. Is it correct in general terms that ADM was willing to use the Cabrera property but wanted it clear, only involving Mr. Cabrera? Is that the general nature of the transaction? Right. It wanted a partner. He was the partner it wanted because it was his property, and so it was a two-person venture, as that was always their intent. And he could have had 100 partners. He could have had one partner. He could have had his wife with .001 percent interest, as she did have in the Lamera. So these were requirements of the company we used to call Archer Daniels Midland? That — yes. These were their requirements in order to enter into the transaction? That was ADM Brazil. Did your client have anything to do with the documentation of those events? No. As I said, it was a fully — Did he plan or supervise or instruct the details of those transactions? Certainly not. This was done in Brazil by Brazilian lawyers and accountants over a period, as I said, from November of 2007 until finally closing in, I think, October of 2008. So there was a huge amount of due diligence and documentation. And the quota purchase agreements are part of the record here. They are quite voluminous and complex. Our client, the most she did at all was to help Mr. Cabrera understand them a little better, because he was — had not done this kind of transaction before. So from your point of view, this is no different than a real estate broker in San Francisco finds a willing buyer of a property, but there are some details to be worked out to make sure that the title is clear. And all your client was looking to do was to put the two parties together. The details of the transaction were up to ADM and Cabrera. Absolutely. And even less than a broker, which normally the broker is the sophisticated party in a transaction between an unsophisticated buyer and seller who have never done this before, or maybe they have done it once in their lives. In this case, ADM had a whole plethora of people. And they were to be involved in the management of the entity, right? They wanted management control. They did not want to — this was not a passive investment where they were handing somebody some money to do with what he wanted. They helped him build the biofuel plant on his property. They each — there were four directors of the LLC, or four managers of the LLC, and each party, Cabrera and ADM, appointed two of them so that they would always have joint control. And I take it your client was seeking much more than $400,000. Interestingly, we had sought more for other parts of the transaction. The jury decided that the only thing we should be compensated for was the amount of cash that was paid by ADM to Mr. Cabrera for his interests, not for anything he bought from his wife, his brother, or his bank. And so our involvement was strictly in what he sold to ADM personally. Okay. Thank you, Your Honor. Well, I might add one note. I found, after I did my brief, and I apologize for not having found it in a timely manner, and I sent a copy last night to Mr. Sangster and Mr. Ball, a SEC no-action letter dated January 31, 2014. It's 2014 Westlaw 356983. You've told your opposing counsel about that? We've sent him a copy of it, yes. Okay. Can you leave a copy with the clerk? Certainly, Your Honor. And the point of that is that the SEC has decided that transactions such as this and even transactions in which the alleged broker or agent absolutely has participated in introducing a securities transaction. What's the date of that? January 2014. So it's two years old. It's two years old. And I did not see it. It could have been discovered two years ago. It could have been discovered. No doubt about it, Your Honor. Okay. But in any event, they would not hold Iguasu to have required registration. They've made an exemption for broker-dealers dealing with the purchase of control of private companies not involving a public offering. Okay. So the SEC does not believe that the securities laws are intended to cover this kind of transaction. Your Honor, first of all, I'd like to respond to your questions or counsel's response to your questions about Iguasu's role in the transaction. Counsel's description is completely contrary to the record. Tell us how. I would invite Your Honor's attention to Excerpt of Record, Pages 1-0-1, 054-55, in which Mr. Fernandez describes literally hundreds of communications with Ms. Saturam, who was the president, in which she recommended language. She advised and made recommendations about the value of the transaction. She advised the parties of the manner and means of consummating the transaction. So the record is completely contrary to counsel's descriptions of it. That's 1054-55? 1054 through 1055, correct. Thank you. In terms of, Your Honor, you mentioned the Landreth case, and I would point out that you don't just simply look at Landreth, because that's Federal law. You also have to look at California law, which defines interest in a limited liability company as securities, unless the person who's asserting an exemption can prove that all parties actively participated in management, and it was undisputed that Mr. Cabrera could not and did not participate in management. So by definition under the California security statute, the LLC interests were securities. And my red light just came on. Yes. But I want to make sure you have an opportunity to respond to this SEC no-action letter that your opposing counsel just highlighted for us. He indicated he gave it to you last night. Do you want to respond here? Do you want to submit a written brief in response? I think I'll just respond here, Your Honor. I mean, courts do give no-action letters some deference when they are matters of interpretation. There is nothing in this no-action letter that interprets Congress' statute. It's simply the enforcement division saying, under the circumstances here, we're not going to take enforcement activity. And, in fact, the commentary that's followed this no-action letter has pointed out that it has no impact on parties raising the lack of registration as a defense in an action to collect commissions. So it's simply the enforcement division saying, we're not going to spend our time and money prosecuting these things. In this particular case. Under the facts that were presented in that no-action letter, it gives a long list of conditions that have to apply. Most, frankly, do apply to this case. Some do not. Because Ms. Suturum played a role in, I think, getting the parties together in order to consummate the transaction. And these are not restricted shares. So some of the conditions in the no-action letter simply don't apply here. But, regardless, our defense is based on what Congress' statute says, not on what the enforcement division says is worth its time and money to prosecute. Okay. Thank you very much. Thank you very much. Thank you both for your arguments here. The case is now submitted.
judges: Hawkins, Murguia, Murphy